# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **MELISSA BRUMLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-0677** |
| | ) | **Judge Aleta A. Trauger** |
| **UNITED PARCEL SERVICE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant United Parcel

Service, Inc. ("UPS"), seeking judgment in its favor on all claims asserted against it by plaintiff

Melissa Brumley. (Doc. No. 15.) Brumley filed a Response in Opposition, which she also

characterizes as a Counter Motion for Summary Judgment. (Doc. No. 21.) Despite the parties'

failure to comply with this court's Local Rules pertaining to the filing of motions for summary

judgment, Local Rule 56.01 in particular,[1] the court deems the motions to be fully briefed and

---

[1] Local Rule 56.01 pertains to the filing of the movant's statement of undisputed facts, the non-movant's response thereto, the non-movant's statement of "additional facts as to which the non-movant contends there exists a genuine issue to be tried," and the reply to such a statement. UPS did not file a separate statement setting forth each fact in a separate, numbered paragraph, leaving space below each fact for the plaintiff's response, as required by Local Rule 56.01(b). Instead, the defendant's Statement of Material Facts is incorporated within its Memorandum in Support of its Motion for Summary Judgment; each paragraph incorporates substantially more than one fact; and the document did not leave space below each fact for the plaintiff to fill in her response. (*See* Doc. No. 51-1, at 3–8.) Brumley did not object to the incorrect formatting and filed a response thereto. (Doc. No. 21-2.) The factual record is therefore sufficiently well developed to allow the court to ascertain which facts are undisputed. However, the plaintiff, rather than filing a statement of additional facts that she contends are in dispute, as contemplated by Rule 56.01(c), instead filed a separate statement of additional facts that she contends are undisputed. In its Reply, UPS attempted to respond to each of these facts, showing that they are, in fact, disputed.

ripe for review. For the reasons stated herein, the court will grant the defendant's motion and

deny the plaintiff's.[2]

## I.    Procedural Background

Brumley's Complaint against UPS, filed on April 4, 2017, purports to assert six separate

claims for relief:

> Count One: failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"),[3] based on "direct evidence" that "UPS never allows someone to work with permanent work restrictions" (Compl. ¶ 17);
>
> Count Two: failure to accommodate in violation of the ADA, based on a failure to engage in good faith in the interactive process as required by the ADA (Compl. ¶¶ 19–37);
>
> Count Three: discrimination in violation of the ADA as a result of her permanent work restrictions (Compl. ¶¶ 38–46);
>
> Count Four: workers' compensation retaliation (Compl. ¶¶ 47–55);
>
> Count Five: denial of the right to leave under the Family and Medical Leave Act ("FMLA") (Compl. ¶¶ 56–62); and
>
> Count Six: disability discrimination in violation of the Tennessee Human Rights Act ("THRA") and the Tennessee Disability Act ("TDA") (Compl. ¶¶ 63–67).

The defendant filed its Motion for Summary Judgment and supporting Memorandum on

November 15, 2017 (Doc. Nos. 15, 15-1) , and the plaintiff filed a timely Response and untimely

Counter Motion on December 5, 2017 (Doc. No. 21). The defendant has filed a Reply (Doc. No.

24), in which it also responds to the plaintiff's Statement of Additional Undisputed Facts (Doc.

---

[2] As the defendant points out, the plaintiff's Counter Motion is not timely, having been filed on December 5, 2017, twenty days after the November 15, 2017 deadline for filing dispositive motions established by the Initial Case Management Order. (Doc. No. 10.) The defendant requests additional time to respond to the motion if the court nonetheless considers it as a motion. The record is adequately developed to permit consideration of the plaintiff's Counter Motion. In any event, the plaintiff's Counter Motion is mooted by the court's conclusion that the defendant is entitled to summary judgment in its favor.

[3] The statute, as amended, is referred to herein, for simplicity, as the ADA.

No. 21-3) and her arguments in support of her Counter Motion. In her Response, the plaintiff expressly withdraws her claims for workers' compensation retaliation and FMLA violations. (*See* Doc. No. 21, at 14.) In addition, it is clear that her claims under the THRA and TDA are governed by essentially the same standards that pertain to her ADA claims and are subsumed by the federal claims. *See e.g.*, *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (applying ADA framework to TDA); *Hodge v. Henry Cnty. Med. Ctr.*, 341 F. Supp. 2d 968, 979 (W.D. Tenn. 2003) (applying ADA framework to THRA).[4] The court therefore does not address the THRA and TDA claims separately from the ADA claims.

## II.    Facts

The facts stated herein are undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

UPS operates a business that delivers packages to homes and businesses around the world. (Cooper Decl. ¶ 3, Doc. No. 15-4.) At all times relevant to this action, UPS employed Brumley part-time as a sorter and temporary cover driver at a UPS warehouse in Franklin, Tennessee (the "Franklin Center"). She was supervised by center manager Richard Bonee, who oversaw the operations at the Franklin Center. (Cooper Decl. ¶ 4.) Brumley is also a member of the National Brotherhood of Teamsters Union, Local 480 (the "Union"). (Cooper Decl. ¶ 5.)

According to Bonee, in all of the various sorting positions at UPS, sorters are required to

---

[4] In passing the ADAAA, Congress intended to "reinstat[e] a broad scope of protection to be available under the ADA" and to reject the "inappropriately high" standards for interpreting the term "substantially limits" created by two Supreme Court decisions: *Sutton v. United Air Lines*, 527 U.S. 471 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002). ADA Amendments Act of 2008, Pub. L. 110–325, 122. Stat. 3553, § 2 (2008). The THRA and TDA have not been similarly amended and maintain the more stringent standards of the ADA prior to amendment. Because the plaintiff cannot establish an ADA claim, as discussed herein, she necessarily cannot establish claims under the THRA or TDA. *See Cardenas-Meade*, 510 F. App'x at 370 n.3 (noting that the TDA does not require reasonable accommodations).

frequently lift items weighing between 20 and 50 pounds and occasionally lift items weighing 51 to 70 pounds. (Bonee Decl. ¶ 4, Doc. No. 15-5.) Brumley admits that she was told when she was hired that her job required being able to lift up to 70 pounds. (Brumley Dep. 15:23, Doc. No. 15-3, at 3.) The written job description of "sorter" provides that sorters in all sorting positions must frequently lift 20 to 50 pounds, occasionally lift 51 to 70 pounds, and constantly lift packages below the waist and overhead. (Physical Demand Assessment, Sorter Position, Bonee Decl. Ex. 1, Doc. No. 23-1.)

According to Bonee, "local sort" (to which the parties also refer as "small sort") is a subset of the sorter position and requires sorters to handle small packages weighing about 10 pounds or less (*e.g.*, letters). (Bonee Decl. ¶ 6.) Sorters in local sort grab small packages traveling along a conveyer belt and place them into various slots, depending on the package's final destination. (Bonee Decl. ¶ 6.) Once the items are sorted, sorters bundle several small packages into a bag, lift the bag, and place it on another conveyor belt, where the packages are then transported to a package car for delivery. (Bonee Decl. ¶ 6.) Bonee testified that, to maximize efficiency, sorters must fill their bag with multiple small packages before delivering it to the other conveyor belt, and, depending on the packages, filled bags can frequently weigh 20 to 50 pounds and occasionally 51 to 70 pounds. (Bonee Decl. ¶ 6). In addition, according to Bonee, even sorters assigned to local sort must sort packages of varying weights, depending on the facility's needs, and must remain flexible to work in different sorting positions to fulfill warehouse demands. (Bonee Decl. ¶ 4.)

Although the plaintiff does not dispute that she was told when hired that her position required lifting up to 70 pounds (Brumley Dep. 15:19-23, Doc. No. 15-3, at 3), she insists that she was employed not as a general sorter but in local sort, which, she contends, is classified

differently. In support of this position, she cites to Article 49 § 4 of the Teamsters Southern Region and United Parcel Service Supplement Agreement to the National Master United Parcel Service Agreement for the period of August 1, 2013 through July 31, 2018 ("Union Agreement"). (Doc. No. 21-2 ¶ 2 (citing Doc. No. 21-16).) As the defendant points out, however, the Union classification of jobs for purposes of seniority and bidding does not affect the actual physical requirements for, and classification of, the jobs for which the plaintiff was hired.

The plaintiff also points to supervisor Doug Grissom's testimony at the plaintiff's workers' compensation hearing, in which he stated that the local sort job did not have a heavy lifting requirement. (Grissom Test'y, Workers' Compensation Hr'g Tr., 82:11–15, Doc. No. 21-13.) The plaintiff further relies on her own experience in working the job for five years, during which, she claims, she was never required to lift heavy weight. Brumley admits that she was required to handle bags as part of her sorter job duties (Brumley Dep. 44:18–25, Doc. No. 15-3, at 20), but she testified that it was up to each worker's discretion as to how many items to put in each bag and that she was never required to fill the bags completely. (Brumley Dep. 44:12–17, Doc. No. 15-3, at 20.)

Brumley also denies that she was "at all times" employed as a temporary cover driver, but she admitted in her deposition that driving was a part of her job description. (Brumley Dep. 21:1–3, Doc. No. 15-3, at 9.) Doug Grissom explained that a temporary cover driver "comes in temporarily" to "drive [the UPS delivery van] whenever . . . a full-time driver [is] on vacation or they call out sick or if we go up on routes." (Grissom Test'y, Workers' Compensation Hr'g Tr., 82:20–23, Doc. No. 21-13.) When working as a temporary cover driver, Brumley served as a substitute for full-time package car drivers who were either sick or on vacation and drove the familiar brown UPS package car to pick up and deliver packages to local homes and businesses.

(Bonee Decl. ¶ 7.) Brumley testified that she lifted packages weighing more than 70 pounds while working as a cover driver. (Brumley Test'y, Workers' Compensation Hr'g Tr. 15:14–20, Doc. No. 15-7, at 2.)

In fact, on December 18, 2015, while working as a cover driver, Brumley injured her back unloading heavy packages from a delivery truck. Thereafter, Brumley received workers' compensation benefits as a result of her injury. Brumley selected Dr. John Klekamp from a panel of doctors to provide treatment for her injury. In January 2016, Brumley entered into an agreement with UPS to perform Temporary Alternative Work ("TAW") for 30 days, which encompassed performing safety inspections of package cars. After her TAW period expired, Brumley was placed on temporary disability status and, consequently, was on a leave of absence from work that extended until July 2016.

On July 29, 2016, Brumley visited Dr. Klekamp to receive additional treatment for her back injury. During this visit, Dr. Klekamp provided Brumley with a return-to-work note with permanent work restrictions requiring her to avoid lifting more than thirty pounds and to avoid pushing or pulling more than 30.5 pounds. (Doc. No. 15-3, at 62.) Dr. Klekamp also gave Brumley a second return-to-work note that stated: "She may return to work on 07/29/2016. Restrictions: May return to local sort. Restriction: No driving." (Doc. No. 21-4.) Brumley hand-delivered both notes to Bonee on July 29, 2016.

On July 29, 2016, Brumley returned to the Franklin Center and clocked in. After Brumley clocked in, Bonee informed her that she could not return to work with restrictions. (Brumley Dep. 21:18–22:1, Doc. No. 15-3, at 9–10.) Bonee decided to send Brumley home, since both of her job duties—sorter and driver—required tasks that she was restricted from performing. (Bonee Decl. ¶ 12.) According to Brumley, Bonee told her that, although she could not return to

work with her current work restrictions, she could get a work accommodation for her restrictions. (Brumley Test'y, Workers' Compensation Hr'g Tr. 44:7–14, Doc. No. 15-7, at 5 ("Richard [Bonee] said I could not return with permanent restrictions . . . . Well, I'm sorry. I take that back. He did say there was supposed to be work accommodations for permanent work restrictions.").)

After that day, apparently beginning on August 16, 2016, the plaintiff filed numerous Union grievances complaining that she had improperly been denied the right to work with restrictions, despite having presented a return-to-work note from her doctor. (*See, e.g.*, Doc. Nos. 21-5 through 21-11.) According to UPS Occupational Health Supervisor Jurgen Rosner, he became aware that Brumley had requested a job-related accommodation on August 18, 2016. (Rosner Decl. ¶ 3, Doc. No. 15-6.) The record does not reflect what form this request took, but Rosner's response letter, dated August 18, 2016, states that, on that same date, "we" (presumably meaning his department) "received notification" that Brumley had requested a job-related accommodation. (Doc. No. 23-2, at 3.)[5] This letter constitutes UPS's initiation of its own internal ADA interactive process, to which it assigned Rosner and Human Resources Manager Elveta Cooper to coordinate with Brumley regarding her request. (Rosner Decl. ¶ 3.) The plaintiff insists, however, that her return to work on July 29, 2016, with her doctor's return-to-work note, constituted a request for an accommodation.

Regardless, it is undisputed that, on August 18, 2016, Rosner sent Brumley a letter acknowledging her request for an accommodation and asking her to submit two medical forms so that UPS could evaluate her restrictions and identify possible accommodations. (Brumley Dep. 28:3–14, Doc. No. 15-3, at 14; Rosner Decl. ¶ 4, Doc. No. 15-6; Rosner Decl. Ex. 1, Doc. No.

---

[5] Although the factual record does not make this clear, the court surmises that UPS may have treated the plaintiff's August 16, 2016 Union grievance as a request for accommodation and, at that point, designated Rosner to respond to it.

23-2, at 3.) The first form was a Request for Medical Information form to be completed by Dr. Klekamp, and the second was an Authorization for Release of Health Information to be completed by Brumley. (Brumley Dep. 28:15–19, Doc. No. 15-3, at 14.) In his letter, Rosner warned Brumley that, "[b]ecause we cannot continue our assessment of your request until we have received the completed medical forms, it is to your benefit to return this information as quickly as possible, preferably within the next two weeks." (Brumley Dep. 28:20–29:5, Doc. No. 15-3, at 14–15; Doc. No. 23-2, at 3.) The letter was scheduled for delivery on August 22, 2016. (Rosner Decl. Ex. 1, Doc. No. 23-2, at 1.)

Rosner sent Brumley a second letter, dated September 1, 2016, reminding Brumley to submit the medical forms. (Brumley Dep. 52:5–18, Doc. No. 15-3, at 25; Rosner Decl. Ex. 2, Doc. No. 23-2.) Rosner sent Brumley a third letter, dated September 12, 2016, asking Brumley about the status of her outstanding paperwork. (Brumley Dep. 52:19–22, Doc. No. 15-3, at 25; Rosner Decl. ¶ 6.) Finally, on September 14, 2016, Brumley faxed both forms to UPS. (Brumley Dep. 34:3–5, Doc. No. 15-3, at 16; Rosner Decl. Ex. 3, Doc. No. 23-4.)

On September 23, 2016, Rosner sent Brumley a letter notifying her that, based on the medical forms she had provided, she might be eligible for a reasonable accommodation. (Doc. No. 15-3, at 73–74.) Rosner asked Brumley to provide dates she could attend a meeting to discuss her restrictions and possible accommodations. (*Id.*) That meeting took place on October 11, 2016, as that was the earliest date on which Rosner and Cooper could both attend the meeting with Brumley. (Cooper Decl. ¶ 6; Rosner Decl. ¶ 8; Brumley Dep. 40:19–24, Doc. No. 15-3, at 18.)

At the meeting, Brumley informed UPS that she wanted to voluntarily discontinue the interactive process and return to Dr. Klekamp to get her work restrictions lifted, rather than be

accommodated with another job that she could perform with her work restrictions. (Brumley Dep. 50:25–51:18; 96:12–21; 103:6–14; 198:11–199:1, Doc. No. 15-3, at 23–24, 40, 45, 57–58.) Cooper replied that, if Dr. Klekamp removed Brumley's lifting and driving restrictions, then Brumley could return to work without the need for an accommodation. (Brumley Dep. 95:15–96:11, Doc. No. 15-3, at 39–40.) Brumley left the meeting planning to get her restrictions lifted, and UPS kept the interactive process open until it verified that her restrictions had, indeed, been lifted and that she had returned to work. (Brumley Dep. 198:23–199:8, Doc. No. 15-3, at 57–58; Rosner Decl. Ex. 4, Doc. No. 23-5.)

On October 27, 2016, Brumley saw Dr. Klekamp to request that he remove her restrictions. (Brumley Dep. 53:7–10, Doc. No. 15-3, at 26.) During this visit, Brumley told him she was "no longer driving," and he "felt [like] she could return to [her] work." (Brumley Dep. 103:4–5, Doc. No. 15-3, at 45.) Consequently, Dr. Klekamp lifted Brumley's restrictions on Thursday, October 27, 2016, and she returned to work on Monday, October 31, 2016. (Brumley Dep. 53:7–54:14, Doc. No. 15-3, at 26–27.) On November 7, 2016, UPS closed the interactive process because Brumley had returned to work with no restrictions. (Rosner Decl. ¶ 9, Doc. No. 15-6; Rosner Decl. Ex. 4, Doc. No. 23-5.)

## III. Legal Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting]

forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d 374 (citing *Anderson*, 477 U.S. at 252).

## IV.    Analysis

Brumley's Complaint purports to assert three separate claims under the ADA: (1) failure to accommodate, based on "direct evidence" that "UPS never allows someone to work with permanent work restrictions" (Compl. ¶ 17); (2) failure to accommodate, based on UPS's failure to engage in good faith in the interactive process as required by the ADA; and (3) disability discrimination based on the plaintiff's permanent work restrictions.

The defendant seeks summary judgment in its favor on all three claims. The plaintiff contends that disputed questions of fact preclude summary judgment in favor of the defendant but that undisputed facts mandate entry of summary judgment in her favor. The court concludes, as discussed herein, that the plaintiff's claims fail, and the defendant is entitled to summary judgment, because: (1) Brumley has no direct evidence of discrimination; (2) any delay in the

interactive process was not unreasonable as a matter of law; (3) the plaintiff herself abandoned the interactive process and withdrew her request for an accommodation; and (4) the plaintiff has not alleged any form of "discrimination" on the basis of disability, other than the alleged failure to accommodate.

### A.     The ADA Framework

The ADA provides that no covered employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Act defines discrimination to include the failure of a covered employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]" 42 U.S.C. § 12112(b)(5)(A).

If the plaintiff has direct evidence that she suffered discrimination based on a disability, she will be entitled to relief, if she establishes that she was "disabled" as defined by the ADA and that she is "otherwise qualified for the position," despite the disability, either without accommodation, "with an alleged 'essential' job requirement eliminated," or "with a proposed reasonable accommodation." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)); *see also Hendrick v. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004) (stating that a plaintiff can prove disability discrimination by "direct evidence that the employer relied on [the plaintiff's] disability in making an adverse employment decision, or if the employer admits to reliance on the handicap").[6]

---

[6] *But see* 42 U.S.C. § 12201(h) (noting that an employer "need not provide a reasonable accommodation . . . to an individual who is only 'regarded as' disabled"). Both parties spend an

In the absence of direct evidence, the plaintiff may establish a *prima facie* claim of failure to accommodate under the ADA by showing that: (1) she was disabled within the meaning of the Act; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) UPS knew or had reason to know about her disability; (4) she requested an accommodation; and (5) UPS failed to provide the necessary accommodation. *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016). If she makes this *prima facie* showing, the burden shifts to the defendant to show that the challenged job criterion is essential, or that the proposed accommodation will impose an undue hardship upon the defendant. *Id.*

### 1. Count One: Direct Evidence of Failure to Accommodate

Essentially, the plaintiff's position here is this: her doctor released her to return to work on July 29, 2016 with restrictions. She returned to work, clocked in, and presented her doctor's notes identifying her restrictions to her supervisor, Richard Bonee. Bonee immediately informed her that she could not work with those restrictions. He sent her home rather than allowing her to work that day. In other words, she appears to claim that (1) she was disabled as a result of the restrictions on lifting and driving, and (2) she was qualified for her position with the accommodation of not being required to drive or to lift more than 30 pounds. She also claims that she has direct evidence of unlawful ADA discrimination in the form of Richard Bonee's announcement "to multiple people" that "UPS does not allow permanent work restrictions." (Doc. No. 21, at 3–4.) Similarly, the plaintiff contends that UPS has a discriminatory policy of defining each job as requiring, as an "essential function," that each employee be available at any time to "substitute" in another employee's position. "Said fiction," she claims, "removes the

_____

inordinate amount of time and ink arguing that UPS either did or did not "regard" the plaintiff as disabled. Both parties fail to recognize that a plaintiff who is merely "regarded as" disabled cannot bring a claim based on a failure to accommodate.

ADA obligation to ever accommodate lifting restrictions." (Doc. No. 21, at 2.)

The plaintiff's contention regarding this purported direct evidence is refuted by her own testimony. She testified during the hearing on her workers' compensation claim: "Richard [Bonee] said I could not return with permanent restrictions . . . . Well, I'm sorry. I take that back. He did say there was supposed to be work accommodations for permanent work restrictions." (Doc. No. 15-7, at 5.) In other words, despite the plaintiff's repeated assertions that Bonee announced in front of numerous witnesses that UPS never permits workers with permanent restrictions to return to work, the plaintiff herself contradicted that assertion in testimony under oath. She has not pointed to any actual evidence that UPS refuses to accommodate lifting restrictions, regardless of how it defines a job's functions, in her case or in any other case. Moreover, as discussed below, the question of which functions were actually essential to her job was mooted by the plaintiff's abandonment of the interactive process prior to its completion.

The plaintiff also argues that UPS has a facially discriminatory policy of treating "a disability that is temporary in nature . . . disparately from a disability that is exactly the same, but permanent. Thus, while reasonable accommodation exists when the restriction is temporary, UPS blocks the accommodation when the restriction becomes permanent. The accommodation is still available, but an arbitrary and discriminatory wall is thrown up to rid themselves of the disabled." (Doc. No. 21, at 2.) This policy, assuming it exists, is not facially illegal and does not constitute direct evidence of discrimination.

The ADA, in fact, does not prohibit such distinctions between temporarily and permanently disabled employees. That is, while an employer may allow an employee to temporarily avoid certain essential job duties during recovery from an injury, the employer has no obligation to allow the employee to remain permanently in a newly created position that

excludes essential job duties. *See, e.g., Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 662 (W.D. Ky. 2012) ("Although BHA allowed Azzam to work a reduced schedule and avoid call duties following her stroke, 'the ADA does not require employers to accommodate individuals by shifting an essential job function onto others' or by creating a position to accommodate a disabled employee." (quoting *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000), and citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996)).

Because the plaintiff has no direct evidence of disability discrimination, the court will analyze her claim under the standards pertaining to indirect evidence.

> 2. *Count Two: Indirect Evidence of Failure to Accommodate and to Engage in Good Faith in Interactive Process*

As indicated above, to state a *prima facie* case of ADA discrimination based on failure to accommodate, the plaintiff must show that she is disabled but otherwise qualified for the position in question, that UPS knew or had reason to know about her disability, and that she requested, but UPS failed to provide, a necessary accommodation. *Deister*, 647 F. App'x at 657. The plaintiff's claim is premised upon UPS's denying her the accommodation she requested: that she be placed in local sort with no driving and no heavy lifting. She argues that UPS violated its obligation to participate in good faith in the interactive process, 29 C.F.R. § 1630.2(o)(3), by engaging in unreasonable delays in processing her request for an accommodation and by "requir[ing] Ms. Brumley's doctor to lift all work restrictions before allowing her back to work." (Compl. ¶ 32.)

Even assuming that the plaintiff has succeeded, at a minimum, in creating a material factual dispute with respect to each of the other elements of her *prima facie* case, her claim fails because she cannot show that UPS failed to accommodate her request. The undisputed facts

show that Brumley voluntarily abandoned the interactive process without giving UPS the opportunity to respond to her request for an accommodation. In attempting to avoid the consequences of her own action, Brumley argues that (1) UPS's "accommodation process is a form over substance procedure that . . . purposely serves to delay a return to employment"; (2) UPS violated the Union contract by failing to conduct the interactive process at the "Hub" level; and (3) Brumley was "bullied" into abandoning the interactive process and instead persuading her doctor to have her restrictions lifted rather than risk being terminated.

The law and evidence simply do not support the plaintiff's position. First, with regard to the plaintiff's insistence that UPS violated the Union Agreement, this argument appears to conflate the requirements of the ADA with the requirements of the National Labor Relations Act. The ADA requires only that the employer engage in the interactive process in good faith, not to comply with a collective bargaining agreement. And the plaintiff has not raised an actual claim based on UPS's violation of the Union Agreement.

Second, there is no evidence in the record that the plaintiff was bullied or coerced into abandoning the interactive process. In her deposition, the plaintiff testified that, during the initial meeting to discuss her request for an accommodation, Elveta Cooper told her that the interactive process required the company to review the employee's restrictions and find a position that matched those restrictions. (Brumley Dep. 50:14–15, Doc. No. 15-3, at 23.) Brumley understood that, if she had not chosen to "go ahead and have the restrictions removed," she could have "proceeded along with the ADA accommodation process and located another placement." (Brumley Dep. 198:11–22, Doc. No. 15-3, at 57.) The plaintiff instead volunteered to Cooper that Dr. Klekamp was willing to lift all restrictions except the restriction on driving. (Brumley Dep. 50:14–51:2, Doc. No. 15-3, at 23–24; *see id.* at 198:23–199:1, Doc. No. 15-3, at 57–58 ("Q.

Okay. And you chose to go ahead and get the restrictions lifted rather than proceeding with the process? A. Kind of both of our agreement, but, yes.").) Brumley confirmed that it was her decision to return to Dr. Klekamp to get him to lift her restrictions. (Brumley Dep. 51:12–18, Doc. No. 15-3, at 24.) The plaintiff insists in her Response that she was bullied into taking that step, but she offers no actual evidence in support of that assertion.

Regarding UPS's purported delay in processing the plaintiff's request for an accommodation, "[t]he interactive process begins when an employee requests an accommodation. Once this process has begun, both the employer and the employee have a duty to act in good faith, and the absence of good faith, including *unreasonable delays* caused by an employer, can serve as evidence of an ADA violation." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005) (emphasis added; internal citation omitted); *see also Breen v. Dep't of Transp.*, 282 F.3d 839, 844 n.7 (D.C. Cir. 2002) (holding that a material factual dispute concerning the responsibility for a one-year delay in communicating about the need for medical documentation about plaintiff's disability precluded summary judgment in favor of defendant agency); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."), *quoted in Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999). Consistent with this authority, non-binding EEOC enforcement guidance states that "[u]nnecessary delays can result in a violation of the ADA." EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (2002).[7] "In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include:

---

[7] This document is available online at https://www.eeoc.gov/policy/docs/accommodation.html.

(1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer each contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was simple or complex to provide." *Id.* However, "undue delay is only an ADA violation to the extent it renders an accommodation (if any) unreasonable; the statute provides no separate claim for undue delay." *Schilling v. La. Dep't of Transp. & Dev.*, 662 F. App'x 243, 245 (5th Cir. 2016) (declining to hold that delay alone may give rise to liability for failure to accommodate when a reasonable accommodation is ultimately provided, while acknowledging that "the manner in which an employer engages in the interactive process and the speed at which that process occurs inform whether the employer has acted in good faith" (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 & n.6 (5th Cir. 1999)).

In this case, the plaintiff apparently believes that she should have been accorded an on-the-spot accommodation on July 29, 2016, the day she returned to work with her doctor's note, and that Bonee's refusal to allow her to return to work that day constituted a *per se* violation of the ADA. In addressing this argument, both parties appear to confuse and conflate the questions of whether the lifting and driving portions of the plaintiff's jobs were legitimately part of her job description and whether they were "essential" components of her job, as that term is defined by 29 C.F.R. § 1630.2(n)(1). The court accepts, for purposes of the defendant's Motion for Summary Judgment, that there is a material factual dispute as to whether the ability to lift up to 50 pounds frequently and 51 to 70 pounds occasionally was an essential function of the UPS sorter position, at least for an employee assigned to local sort. There is also a factual dispute as to whether it was essential for sorters to be able to cover other positions in the warehouse. However, it is undisputed that these abilities were part of the plaintiff's job description and that

she was apprised of these requirements when she was hired. (*See* Bonee Decl. Ex. 1, Doc. No. 23-1; Brumley Dep. 15:23, Doc. No. 15-3, at 3.) As a result, UPS had no obligation immediately to grant the plaintiff's request for an accommodation in the form of removing those tasks from her job description, and it was not unreasonable for the company, instead, to require the plaintiff to engage in the interactive process to determine whether that was an appropriate accommodation. *See, e.g.*, *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (an employee "cannot force her employer to provide a specific accommodation if the employer offers another reasonable accommodation" (citing *Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004)).

Moreover, the plaintiff cannot show that the delays occasioned by UPS in processing her request and engaging in the interactive process were unreasonable, even assuming that the plaintiff's attempt to return to work on July 29, 2016, with her doctor's note requesting restrictions, was sufficient to put UPS on notice that she was disabled and requesting an accommodation. The undisputed facts show that Jurgen Rosner contacted her to begin the interactive process immediately upon being apprised that she sought an accommodation, possibly in response to the plaintiff's having filed a Union grievance on August 16, 2016. The plaintiff has failed to present any law to support the proposition that the approximately three-week delay (from July 29 to August 18) in responding to her request could be deemed so unreasonable as to give rise to an inference of bad faith. This conclusion is bolstered by Rosner's encouraging the plaintiff to supply the requested documents as quickly as possible, preferably within two weeks, and his repeated follow-ups with Brumley to inquire as to the status of her providing the requested documentation. The delay from August 22, 2016 (when Brumley received Rosner's letter) until September 14, 2016, when she faxed the requested information, was entirely the

plaintiff's responsibility. Rosner then contacted her just over a week later, on September 23, 2016, to request dates for a meeting to discuss a reasonable accommodation for her disability. Because of scheduling conflicts, that meeting did not occur until October 11, 2016, but the plaintiff has offered no evidence that this delay was the result of bad faith on the part of UPS.

It was during this October 11 meeting that the plaintiff indicated that her condition had further improved and that her physician was willing to remove the lifting restriction. The plaintiff volunteered to meet with her doctor and have her restrictions removed. Upon the meeting's adjournment, all parties expected that the next step would be for the plaintiff to return to her doctor to see if he would lift her restrictions. She did not do so until Thursday, October 27, 2016 (Brumley Dep. 53:7–10, Doc. No. 15-3, at 26), so the delay from October 11 until October 27 was caused by scheduling issues on the plaintiff's and her doctor's part. On October 27, she notified UPS that her restrictions had been lifted and that she wanted to return to her job. She returned to work on Monday, October 31, 2016. It appears that the delay of two business days between her release and her return was occasioned by her supervisors' confusion about whether the ADA interactive process was ongoing. (*See* 10/27/2016 email exchange, Doc. No. 21-17.) Again, there is no evidence of bad faith in this delay.

In sum, nearly half of the delay in question here was attributable to Brumley rather than to UPS, and the plaintiff has not identified any evidence suggesting that any of the delay on UPS's part was unreasonable or the result of bad faith. More to the point, Brumley cannot show that UPS denied her an accommodation, because she voluntarily abandoned her request for an accommodation. UPS, in fact, did not close her ADA case file until she had actually returned to work without restrictions. (*See* Rosner Decl. Ex. 4, Doc. No. 23-5.) The plaintiff's claim for failure to accommodate, therefore, necessarily fails.

2.   *Count Three: Discrimination*

The plaintiff articulates a "Count Three" in her Complaint for discrimination in violation of the ADA, but it is difficult to decipher in what way this claim differs from Count Two, premised on failure to accommodate. She alleges that she was disabled from working as a delivery driver but otherwise qualified to work in sort and that UPS sent her home from work on July 29, 2016, because it "never accommodate[s] permanent work restrictions." (Compl. ¶ 41.) She claims that this policy is discriminatory on its face, insofar as it assigns different standards to work-related disabilities and other types of disabilities. She alleges that she suffered an adverse employment action when she was sent home on July 29 "without pay, benefit, or leave." (Compl. ¶ 43.)

This claim fails for the same reasons as those set forth above: Brumley has no evidence to support her assertion that UPS never accommodates permanent restrictions; UPS did not fail to offer her a reasonable accommodation or to engage in good faith in the interactive process; and her employment was never terminated.

## V.   CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted. The plaintiff is not entitled to judgment in her favor, and her Counter Motion for summary judgment will be denied as moot.

An appropriate Order is filed herewith.

ENTER this 22nd day of January 2018.

_____
ALETA A. TRAUGER
United States District Judge